**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**WESTERN DIVISION**

**SADIE PASCHAL, PENNY CLARK, BECCA COLEMAN,**          **PLAINTIFFS**
**DEBRA FRAZIER, EVANGELA JACKSON, HENRIETTA**
**JAMES, BEVERLY JOHNSON, AMANDA KENNEY,**
**VALERIE LEWIS, ANSHEKA NELSON, ALICIA PETERSON,**
**ASHLEY REED, JUANITA RELEFORD, ANNA RENFRO,**
**PATRICIA SHAVERS, TRACIE SMITH, ANDREA TONEY,**
**LAKEISHA TOWNSEND, and VIRGINIA ZERMENO, INDIVIDUALLY**
**AND ON BEHALF OF OTHERS SIMILARLY SITUATED**

**V.**                    **CASE NO. 4:12-CV-0184 KGB**

**CHILD DEVELOPMENT, INC.,**
**COMMUNITY DEVELOPMENT INSTITUTE HEAD START**          **DEFENDANTS**

**DEFENDANT COMMUNITY DEVELOPMENT INSTITUTE HEAD START'S**
**RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**
**AND BRIEF IN SUPPORT OF CROSS MOTION FOR SUMMARY JUDGMENT**

On March 26, 2012, Sadie Paschal and other Plaintiffs filed a collective/class complaint against Child Development, Inc., Community Development Institute Head Start ("Community Development/HS"), Jo Ann Williams, and Lisa Barber. The latter two defendants have now been dismissed. The claims are for violations of the Fair Labor Standards Act (FLSA), 29 U.S.C. §201 *et seq.*; Employee Retirement Income Security Act, 29 U.S.C. §1001 *et seq.* (ERISA); the Arkansas Minimum Wage Act, A.C.A. §11-4-201 *et seq.*; breach of contract; promissory estoppels; unjust enrichment; statutory penalties under Ark. Code Ann. § 11-4-405(a); and negligence based on a period in which employees did not receive payment for work performed prior to February 11, 2012..

At the outset, it should be noted that this case can be distilled to the following:

1. Community Development/HS was not and is not alleged to have been the Plaintiffs' employer during the relevant time period.

2. Any potential liability is based solely on the argument that Community Development/HS is a successor to Child Development, Inc.

For the reasons set forth herein and in the accompanying Cross Motion for Summary Judgment, Response to Plaintiffs' Statement of Facts in Support of Partial Motion for Summary Judgment, Statement of Material Facts Not in Dispute and the exhibits attached thereto, there is no genuine issue as to any material fact and, therefore, Community Development/HS is entitled to judgment as a matter of law.

## **STANDARD OF REVIEW**

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be entered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  The moving party bears the burden of showing both the absence of a genuine issue of material fact and its entitlement to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 89 (1986); Fed. R. Civ. P. 56(c).

However, once the moving party has met its burden, the non-moving party may not merely rest on the allegations of his pleadings but must set forth specific facts, by affidavit or other admissible evidence, showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e). Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corporation v. Catrett,* 477 U.S. 317, 322 (1986).  The responding

party's duty to set forth specific facts is mandatory, as is the court's obligation to grant summary judgment if such facts are not presented. *Allen v. Entergy Corp*, 181 F.3d 902 (8th Cir. 1999).

## ARGUMENT

### I.  THERE IS NO SUCCESSOR LIABILITY FOR VIOLATIONS OF FEDERAL STATUTES

"The general rule in most states, including Arkansas, is 'that a corporation which purchases the assets of another corporation does not succeed to the liabilities of the selling corporation,'" except in a few limited circumstances.  *Campbell v. Davol, Inc.*, 620 F.3d 887, 891 (8th Cir. 2010), citing *Swayze v. A.O. Smith Corp.*, 694 F. Supp. 619, 622 (E.D. Ark. 1988). However, here is a federal common law doctrine of successor liability in cases involving the rights of employees under various federal employment statutes, including the FLSA and ERISA. *Steinbach v. Hubbard,* 51 F.3d 843 (9th Cir. 1995) (FLSA); *Einhorn v. M.L. Ruberton Const. Co.,* 632 F.3d 89 (3d Cir. 2011) (ERISA). The doctrine is an equitable one and is dependent on a careful balancing of the specific facts of each case. *See Musikiwamba v. Kumar*, 760 F.2d 740, 751 (1985).

The doctrine of equitable successorship was first established by the Supreme Court in *Golden State Bottling Co., Inc. v. National Labor Relations Board*, 414 U.S. 168 (1973), which reasoning has been adopted by the Court of Appeals for the Eighth Circuit. *NLRB v. Leiferman Enterprises, LLC*, 649 F. 3d 873 (8th Cir. 2011).  *Golden State* involved the sale of Golden State Bottling to All American Bottling, which then continued Golden State's bottling business with little change. *Id.* Importantly, however, the sale occurred *after* All American received actual notice of the reinstatement and back pay liability of Golden State for certain unfair labor practice charges. *Id.* As the Court noted in affirming the liability of All American for Golden State's

unfair labor practices, this notice allowed All American to account for the liability when determining the price to pay for the business, to secure an indemnity clause in the sales contract or to negotiate some other protection during the sale negotiations. *Id.*

*Golden State* can be distilled to a three-part test for successorship in federal employment cases:

1. There must be a transfer of assets owned by the predecessor to the alleged successor.

2. The transfer must occur after the successor has received actual notice of the predecessor's liability or potential liability under a federal employment statute in a manner sufficient to allow the predecessor to protect itself against that liability in the sale negotiations; and

3. The successor company essentially continues the business of the predecessor.

The rationale behind this doctrine is readily apparent. First, employees of the predecessor have been harmed, or potentially harmed, by an alleged violation of a federal employment statute which reflects the important public policy of the United States. *Golden State Bottling Co., Inc. v. National Labor Relations Board*, 414 U.S. at 181-182. Second, the assets being sold to an alleged successor might have otherwise been available to satisfy the claims of employees under those statutes. Third, employees are rarely, if ever, parties to the negotiations for the sale of a business or its assets to an alleged successor and, thus, have no ability to protect their separate interests in the sales negotiation. *Id.,* at 182. On the other hand, the company buying the business or its assets is well situated to protect itself from any risk of liability in the same negotiations by factoring it into the sales price, requiring an indemnification or escrow, or by some other means. *Id.,* at 185.

Applying this test requires "striking a balance between the conflicting legitimate interests of the bona fide successor, the public, and the affected employee." *Golden State,* 414 U.S. at

181. As the following discussion will demonstrate, striking this balance under the facts of this case demonstrates that Community Development/HS is not a successor to Child Development, Inc. It did not acquire any corporate assets owned by Child Development, Inc.; it did not have an opportunity to consider any potential liability and protect itself accordingly; and, while it did provide *interim* Head Start services under a new grant award from the federal ACF/OHS, it did not continue the business of Child Development, Inc. *See* Defendant Community Development/HS' Statement of Undisputed Facts ("SOF") and Ex. N thereto.

**No Assets Owned by Child Development, Inc. Were Transferred to Community Development/HS**

Child Development, Inc. was the recipient of a grant from the Office of Head Start, Administration for Children and Families ("ACF/OHS") administered through Region VI of the United States Department of Health and Human Services for the operation of a Head Start program for twelve counties in Arkansas (Tri-Region Arkansas) obtained through the usual competitive application process. *See* Plaintiff's Statement of Facts. On February 2, 2012, that grant was relinquished by Child Development, Inc. *See* SOF ¶ 10, Ex. F, G, and N ¶ 12. Community Development/HS subsequently was assigned a new grant by the National Office of ACF/OHS to act as interim grantee beginning February 11, 2012. *See* SOF ¶ 11 & 15, Ex. D and N ¶ 13.

Real and personal property purchased with ACF/OHS grant monies ("Program Assets") is not owned outright by the grantee. *See* SOF ¶ 20, Ex. J, K, and N ¶ 22. Rather, the federal government maintains an ownership interest in those properties, which are deemed to be held in trust for the beneficiaries of the Head Start Program (45 C.F.R. § 74.37, 1309.21). Pursuant to 45 C.F.R. § 74.37, 1309.21, the Program Assets cannot be encumbered without the approval of

ACF/OHS. Moreover, this federal interest has been specifically asserted against Child Development, Inc., by ACF/OHS.[1] *See* SOF ¶ 20, Ex. K, and N ¶ 22.

Plaintiffs argue that Community Development/HS used the same equipment, the same facilities, served the same children and hired most of the former employees of Child Development, Inc., in providing Head Start services to Tri-Region Arkansas after Child Development, Inc.'s grant was relinquished and that this makes it liable as a successor to Child Development, Inc. What Plaintiffs ignore is that, while Child Development, Inc., held *nominal* title to Program Assets, these Program Assets were actually held in trust for the beneficiaries of the Head Start Program. *See Neukirchen v. Wood County Head Start*, 54 F.3d 809 (7th Cir. 1995) (detailed analysis of the application of this federal interest to a Head Start grant recipient). *See also* SOF ¶ 20, Ex. J, K, and N ¶ 22.   In addition, while Community Development/HS may have *used* Program Assets formerly used by Child Development, Inc., Community Development/HS' use is also subject to the same trust limitations. *See* SOF ¶ 20, Ex. N ¶ 22.  Rather, now that permanent replacement grantees have been selected to provide Head Start services beginning in the summer of 2013, to the counties in Tri-Region Arkansas, Community Development/HS has the same obligation to transfer Program Assets to the selected grantees as required by ACF/OHS. *See* SOF ¶ 20, Ex. M and N ¶ 22.

Under these facts, there has not been the type of permanent sale or transfer of assets required by *Golden State* and its progeny. In *Steinbach v. Hubbard,* 51 F.3d 843 (9th Cir. 1995), the court considered a situation where a company leased facilities from the successor company and continued its business. It did not, however, buy the facilities and, ultimately, the lease was

---

[1] This does not mean that Child Development Inc., has no assets. While it has filed for receivership and dissolution, *In the Matter of Child Development, Inc.,* Case No. CV-2012-1469 (Circuit Ct., Pope Count Ark.), there are assets of which it is disposing in that proceeding. See SOF Ex. O, Receiver's Report of Sale of Real Property at Star City, Arkansas.

terminated and the property returned to the successor. The court found there was no successor

liability stating that "such a failure to ever permanently transfer the business [to the successor]

dispositive." *Id.,* at 846.  In the present case, just as in *Steinbach*, the assets in question were

never permanently transferred to Community Development/HS. *See* SOF ¶ 20, Ex. J, K, and N ¶

22.  While they might not have been returned to Child Development, Inc., the fact is that Child

Development, Inc., held, at most, nominal title to the assets in question, subject to the trust

relationship created by federal regulation. *Id.* Certainly, it would be inequitable to hold

Community Development/HS liable for unpaid wages it had no hand in creating or permitting

when it received no assets from Child Development, Inc., which could be used to pay such wage

claims.

### Community Development/HS Did Not Receive Adequate Notice of Claims

The second requirement of successorship is that the successor receives notice of the

claims or potential claims sufficient to account for it in negotiating the purchase of a business or

its assets. As the Eighth Circuit has observed:

> Since the successor must have notice before liability can be imposed, his potential
> liability for remedying the unfair labor practices is a matter which can be reflected
> in the price he pays for the business, or he may secure an indemnity clause in the
> sales contract which will indemnify him for liability arising from the seller's
> unfair labor practices.

*NLRB v. Leiferman Enterprises, LLC*, 649 F. 3d 873, 879 (8th Cir. 2011), *quoting Golden State*

*Bottling Co., Inc. v. National Labor Relations Board*, 414 U.S. at 185.

Community Development/HS' unique circumstances under the ACF/OHS National

Interim Management Program ("NIMP") contract allowed neither time *nor the ability* to

negotiate any provisions to allow it to accommodate liability for Child Development, Inc.'s

failure to pay wages. *See* SOF ¶ 3, Ex. C and N ¶ 5.   Community Development Institute[2] contracts with the ACF/OHS as the sole national provider of interim Head Start services under the ACF/OHS National Interim Management Program. *Id.*   The NIMP contract requires that Community Development Institute maintain a permanent professional staff capable of providing the knowledge base, procedures, and technical, legal, financial and management expertise necessary for the operation of a Head Start program in accordance with ACF/OHS Performance Standards. *Id.* In the event that a Head Start grant is terminated, relinquished or suspended, ACF/OHS, *without further negotiation*, appoints Community Development Institute to establish an interim Head Start program in the area previously served by the suspended/terminated/relinquished grantee. *Id.* During this interim program operation, ACF/OHS engages in the usual discretionary grant competition process for the selection of a permanent replacement grantee, which includes publicizing the availability of the grant, an evaluation and selection process, and results in a cohort award. *See* SOF ¶ 3, Ex. M and N ¶ 5. In this case, ACF/OHS took over a year to complete the competitive grant process for new permanent replacement grantees for Tri-Region, Arkansas. *See* SOF ¶ 3, Ex. M and N ¶ 5. Upon an NIMP contract appointment, Community Development Institute must be prepared to be onsite as the representative of ACF/OHS within 48 hours of being appointed. *See* SOF ¶ 3, Ex. C and N ¶ 5.   The NIMP contract does not allow for additional negotiations over any potential employee claims against the suspended/terminated/relinquished grantee. *Id.*   Rather, the focus is on maintaining the delivery of services to the underprivileged children eligible for Head Start services. *See* SOF ¶ 3 and N ¶ 5.

---

[2] Community Development Institute is separate and distinct entity from Community Development/HS and is also a Colorado nonprofit corporation organized under § 501(c)(3) of the Internal Revenue Code.

As a requirement of the NIMP contract, Community Development Institute must maintain a roster of qualified onsite staff capable of implementing an interim program in a specific area. *See* SOF ¶ 4 and N ¶ 6.   Community Development Institute assigns Community Development/HS to operate Head Start grant recipient programs on an interim basis when a local Head Start grantee cannot operate a Head Start program. *See* SOF ¶ 5 and 6, Ex. N ¶ 7 and 8. Community Development/HS receives an interim grant from the national ACF/OHS office to fund the provision of these interim services. *See* SOF ¶ 6, Ex. N ¶ 8.   This funding mechanism is different from the regular grant received by permanent Head Start providers which is awarded through the governing Regional Office of the U.S. Department of Health and Humans Services, which in the present case, is Region VI, located in Dallas, Texas. *See* SOF ¶ 11, Ex. H, D, and N ¶ 13.   The grant received by Community Development/HS is a categorical federal grant which can only be used for the purposes set forth in the grant.   *See, e.g., In re Joliet-Will Cnty. Cmty. Action Agency,* 847 F.2d 430 (7th Cir. 1988). *See also* SOF ¶ 16, Ex. L and N ¶ 18.   Paying the obligations of a terminated/suspended/relinquished grantee is not one of those permitted purposes. *See* SOF ¶ 16, Ex. E and N ¶ 18.   Rather, these grants are prospective only, relating to the provision of future services. *See* SOF ¶ 16, Ex. L and N ¶ 18.   Moreover, if such grant funds were used to pay for Child Development, Inc.'s unsatisfied obligations, it would be at the expense of the underprivileged children Head Start serves, which would hardly be fair. *See* SOF ¶ 16, Ex. N ¶ 18.

In the final analysis, it is not enough that an alleged successor has actual knowledge of pending employment claims. The knowledge must empower it to protect itself from the consequences of those claims. *See, e.g.*, *Steinbach v. Hubbard,* 51 F.3d at 847 (successor status denied because "the reality is that [the alleged successor] was in little better position to protect

itself than were the former employees."); *Musikiwamba v. Kumar*, 760 F.2d 740, 750 (1985) ("…it would be grossly unfair, except in the most unusual circumstances, to impose successor liability on an innocent purchaser…when the successor did not have the opportunity to protect itself by an indemnification clause in the acquisition agreement or a lower purchase price.").

In the present case, Community Development/HS had no opportunity to negotiate with ACF/OHS regarding responsibility for any wages that were not paid to employees of Child Development, Inc. *See* SOF ¶ 3, Ex. N ¶ 5.  Negotiation of the contract for interim management services predated notification of Child Development, Inc.'s relinquishment. *See* SOF ¶ 3 and 10, Ex. C, F and N ¶ 5 and 12.  That is a necessary element of a contract requiring an agency to be on standby in the event of an emergency. By the time Child Development, Inc., ceased operations, it was too late to negotiate, and Community Development/HS was already committed to act. *Id.*

### Child Development Inc.'s Business Was Not Continued Without Substantial Change

The third issue under *Golden* State is whether there was a continuation of the predecessor's business by the alleged successor without substantial change. *Golden State Bottling Co., Inc. supra*, 414 U.S. 168 at 184. The Plaintiffs cite to *Brock v. LaGrange Equip. Co.,* 1987 U.S. Dist. LEXIS 14532, Wage & Hour Cas. (BNA) 780 (D. Neb. 1987), for the factors to be considered in determining whether there is sufficient business continuity to permit successor status:

> whether (a) there has been a substantial continuity of the same business operation; (b) the new employer uses the same plant; (c) the same or substantially the same work force is employed; (d) the same jobs exist under the same working conditions; (e) same supervisors are employed; (f) the same machinery, equipment, and methods of production are used; and (g) the same product is manufactured or the same service [is] offered.

*Id.,* at 2.

Certainly, Community Development/HS provided Head Start services as did Child Development, Inc. *See* SOF ¶ 11 and 13, Ex. N ¶ 13 and 15.    It used many, although not all, of the same facilities. *See* SOF ¶ 19, Ex. I and N ¶ 21.    It used equipment and supplies that had been used by Child Development, Inc. *See* SOF ¶ 19, Ex. I and N ¶ 21.    It employed a majority of the employees of Child Development, Inc., although none of its executives or officers. *See* SOF ¶ 19, Ex. L and N ¶ 21.    The children eligible to receive services largely remained the same. *See* SOF ¶ 21, Ex. N ¶ 23.

However, it differed from Child Development, Inc., in numerous ways as well. For example, Community Development/HS has many different job categories and different terms and conditions of employment. *See* SOF ¶ 27, Ex. N ¶ 29.    It implemented a different Employee Handbook, different policies and procedures, different leave and benefits, a unique Operations Manual which governs day to day operations of the classroom, a different unique curriculum, a different organizational structure and staffing pattern and different management oversight. *Id.*

Most significantly, however, Child Development, Inc. was a permanent, long-term grantee selected through the traditional competitive application process. *See* SOF ¶ 17, Ex. H and N ¶ 19.    Provided it met ACF/OHS quality standards, it could have continued to apply for and receive Head Start grants virtually indefinitely. *Id.* That is not true of Community Development/HS which is appointed by ACF/OHS, not through the traditional grant application process, but pursuant to Community Development Institute's NIMP contract. *See* SOF ¶ 3 and 6, Ex. N ¶ 5 and 8.    Where Child Development, Inc. was intended to be a traditional service provider, Community Development/HS was limited to being a temporary interim provider for a period of approximately twelve months. *See* SOF ¶ 6 and 17, Ex. D, H and N ¶ 8 and 19.    We respectfully submit that this difference is so fundamental as to preclude a finding that there was

business continuity between Child Development, Inc., and Community Development/HS. Providing Head Start services in a defined area of one state for an indefinite period is a fundamentally different business than being on standby to perform interim services typically limited to one year in unidentified areas throughout the United States.

**The Conflict of Federal Public Policies Warrants Denial of Successor Status**

This matter also raises significant issues of conflicting public policies which must be balanced against the rights of employees and subsequent innocent recipients of federal funds. *Golden State,* 414 U.S. at 181. Virtually all of the cases applying the standards for successor liability weigh the public policy created by federal statutes protecting employees against the ability of corporations to sell assets and raise capital in the free flow of commerce. Unlike these cases, however, the matter before the Court requires balancing between the public policies created by conflicting federal statutory schemes.  Here, the federal interest in early childhood education and control of the use of federal funds are involved as well.

Community Development/HS is a nonprofit corporation organized under § 501(c)(3) of the Internal Revenue Code. *See* SOF ¶ 2, Ex. B and N ¶ 4.     It does not generate profits and excess revenues. *Id.* It operates exclusively pursuant to categorical grant funds which may be used only to provide the services dictated by the terms of the grant and which do not permit payment for another grantee's errors in operation. *See* SOF ¶ 16, Ex. L and N ¶ 18.

Plaintiffs are implicitly suggesting that those grant funds should go to pay their wages rather than to educate the underprivileged children for whom they are intended, but, unlike *Golden State* and its progeny, this case involves encumbered federal grant funds rather than the profits and other assets of private companies. "[F]ederal funds in the hands of a grantee remain the property of the federal government unless and until expended in accordance with the terms of

the grant." *In re Joliet-Will Cnty. Cmty. Action Agency,* 847 F.2d 430, 432 (7th Cir. 1988).

Therefore, absent consent of the federal government, sovereign immunity prevents a judgment

creditor from garnishing or attaching federal funds. *Fulgham,* 2011 WL 4566447 at *4, citing

*Buchanan v. Alexander,* 45 U.S. (4 How) 20, 20-21 (1846).

A Head Start grantee may not use Head Start funds to satisfy an age discrimination

judgment even though it was the actual perpetrator of the discrimination, unlike here, where the

failure to pay wages was not Community Development/HS's but that of the Child Development,

Inc. *See* SOF ¶ 16, Ex. N ¶ 18.

> [The plaintiff] proved that Wood County illegally discriminated against her based
> on her age, and she obtained a judgment in excess of $ 86,000. She has been
> unable to collect on this judgment, however, because a majority of Wood
> County's money and property is provided by Congress without an accompanying
> waiver of sovereign immunity. Absent a waiver of sovereign immunity,
> Neukirchen cannot attach Wood County's property purchased with federal funds,
> including property costing $ 1000 or less.

*Neukirchen v. Wood County Head Start*, 54 F.3d 809, 816 (7th Cir. 1995).

Moreover, if Community Development/HS is required to enter every interim

management assignment facing potential liability for the unsatisfied obligations of a previous

grant recipient, it will not be able to function and would face very hard questions regarding its

continued ability to serve as the interim Head Start service provider. *See* SOF ¶ 32, Ex. N ¶ 34.

It would be faced with the need either to reduce the scope of services, withdraw from the

ACF/OHS National Interim Management Program or to demand indemnification or significantly

increased grant funding from ACF/OHS which would effectively create a tax on the U.S.

Treasury by increasing the cost of services. *Id.*

It is undisputed that Community Development/HS is an innocent party that played no role

with respect to the events that led to Plaintiffs' claims. It is undisputed that the imposition of

liability would fall heavily on the equally innocent underprivileged children Head Start programs are intended to serve.

**Only Comparable Case Found No Successor Status**

Our review could find no successorship cases, save one, which did not involve private, for profit companies competing in the free market. The body of cases involves selling products and services in the open market. They do not involve competing for federal categorical grants the use of which funds was restricted by the terms of the grant.

Our research disclosed only one case that involved raising the doctrine of successor liability under similar facts--*Baker v. Juniata County Child Care & Development Services, Inc.*, 2008 U.S. Dist. LEXIS 86893; 2008 WL 4748263 (M.D. Penn. 2008). *Baker* involved essentially identical facts to the present case. It was a claim for unpaid wages by a terminated Head Start program and alleged successor liability against the interim Head Start operator—Community Development/HS. After considering the same issues, the district court held that Community Development/HS was not a successor and was not liable for any wages left unpaid by the previous Head Start operator. We respectfully submit that the same result should occur here. *Cf. Addison v. Detroit-Dept. of Human Services,* 2013 U.S. Dist. LEXIS 43131 (E.D. Mich. 2013) (Employee of Head Start program which relinquished its grant has no right of employment by interim Head Start provider).

## II.  THERE IS NO SUCCESSOR LIABILITY UNDER STATE LAW

Plaintiffs contention that Community Development/HS also has successor liability for their claims predicated on state law *i.e.,* Arkansas Minimum Wage Act (2d Amended Complaint, ¶ 93), breach of contract (*Id.,* ¶ 107), promissory estoppel (*Id.* ¶ 117) and unjust enrichment (*Id.,*

¶ 124), is even more tenuous than their claim of successor liability for their claims under federal law.

The successor liability rule in Arkansas is "that a corporation which purchases the assets of another corporation does not succeed to the liabilities of the selling corporation," except in a few limited circumstances. *Campbell v. Davol, Inc.*, 620 F.3d 887, 891 (8th Cir. 2010), citing *Swayze v. A.O. Smith Corp.*, 694 F. Supp. 619, 622 (E.D. Ark. 1988). The few exceptions to the general rule are: (a) where the transferee assumes the debts and obligations of the transferor by express or implied agreement; (b) where there is a consolidation or merger of the two corporations; (c) where the transaction is fraudulent or lacking in good faith; or (d) where the purchasing corporation is a mere continuation of the selling corporation. *Id.* The general rule of successor liability and its exceptions have long been a part of Arkansas law. *Swayze*, 694 F. Supp. at 622, citing *Good v. Ferguson & Wheeler Land, Lumber & Handle Co.*, 153 S.W. 1107 (Ark. 1913). Arkansas courts have been consistently unwilling to expand the exceptions to the successor liability rule beyond these four narrow exceptions. *Campbell*, 620 F.3d at 893-94; *Swayze*, 694 F. Supp. at 693; *Reed v. Armstrong Cork Co.*, 577 F. Supp. 246, 248 (E.D. Ark. 1983).

As the above discussion amply illustrates, none of the four limited exceptions applies to Community Development/HS under the facts of this case. There is no allegation that there was an agreement by Community Development/HS to accept the liabilities of Child Development, Inc. Second, Community Development/HS did not merge with, buy or otherwise acquire Child Development, Inc. *See* SOF ¶ 17 and 20, Ex. N ¶ 19 and 22. Third, there is no suggestion that Community Development/HS engaged in fraud or acted other than in good faith, especially in light of the NIMP contract and the federal regulations governing Head Start grants. Finally, there

was no "mere continuation of the selling corporation" since there was no sale of Child Development, Inc. and none of its assets were acquired by Community Development/HS. *Id.*

The only exception to the successor liability rule that could even arguably apply is the "mere continuation" exception. In applying that exception, Arkansas courts look for a common identity of officers, directors, and stock between the selling and purchasing corporations. *Campbell*, 620 F. 3d at 892; *Swayze*, 694 F. Supp. at 622-23. It is important to note that "it is *not the general overlap of employees that is relevant* in determining whether the mere continuation exception applies; rather, it is the common identity of officers and directors between the selling and purchasing corporations." *Campbell*, 620 F. 3d at 892 (emphasis supplied). Likewise, "*common identity of assets is not one of the factors* that is considered in determining whether a purchasing corporation is a mere continuation of a selling corporation." *Id.* (emphasis supplied). Where there is no evidence of officer or director overlap and where there is no stock transfer, successor liability is generally not imposed. *Id.* Here, no such officer/director overlap exists and there was no stock, or even asset, transfer. *See* SOF ¶ 14, 17 and 20, Ex. N ¶ 16, 19 and 22.Thus, it is clear that there can be no successor liability under state law just as there can be none under federal law.

## CONCLUSION

For the reasons set out above in this brief and the accompanying motion, Community Development Institute/HS respectfully submits that the federal doctrine of successor liability established by *Golden State* simply does not apply to federal grantees. Moreover, even if it could be applied, under the facts of this case, Community Development/HS submits it is entitled to summary judgment and a dismissal of all claims against it. In addition, there can be no successor liability under Arkansas law with respect to the state law claims.

Respectfully submitted,

JACK NELSON JONES & BRYANT, P. A.
2800 Cantrell Rd. Ste. 500
Little Rock, AR  72202
Telephone 501-375-1122
Fax  501-375-1027

*/s/ Stephen W. Jones*
Stephen W. Jones, Ark. Bar No. 78083
*/s/ Debby A. Linton*
Debby A. Linton, Ark. Bar No. 01146

## CERTIFICATE OF SERVICE

I, Stephen W. Jones of Jack Nelson Jones & Bryant, P.A., do hereby certify I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to the counsel of record in this matter.

| | |
|---|---|
| Anthony Bryce Brewer | bbrewer@wbhlawfirm.com |
| John T. Holleman | jholleman@johnholleman.net |
| Maryna O. Jackson | maryna@johnholleman.net |
| Timothy A. Steadman | tim@johnholleman.net - |
| James E. Smith , Jr. | jsmith@smithakins.com |
| William F. Smith , Jr. | smithlawfirm@suddenlinkmail.com |

*/s/Stephen W. Jones*
Stephen W. Jones
Ark. Bar No. 78083