**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**WESTERN DIVISION**

**SADIE PASCHAL, PENNY CLARK, BECCA COLEMAN,**                    **PLAINTIFFS**
**DEBRA FRAZIER, EVANGELA JACKSON, HENRIETTA JAMES,**
**AMANDA KENNEY, VALERIE LEWIS, ANSHEKA NELSON,**
**ALICIA PETERSON, ASHLEY REED, JUANITA RELEFORD,**
**ANNA RENFRO, PATRICIA SHAVERS, TRACIE SMITH,**
**ANDREA TONEY, and VIRGINIA ZERMENO, INDIVIDUALLY**
**AND ON BEHALF OF OTHERS SIMILARLY SITUATED**

**v.**                              **Case No. 4:12-CV-0184 KGB**

**CHILD DEVELOPMENT, INC.,**
**COMMUNITY DEVELOPMENT INSTITUTE HEAD START**              **DEFENDANTS**

**OPINION AND ORDER**

Plaintiffs bring this action against defendants Child Development, Inc. ("Child Development") and Community Development Institute Head Start ("CDIHS") for claims under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b), the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1103, 1104, and 1106, the Arkansas Minimum Wage Act ("AMWA"), Ark. Code Ann. §§ 11-4-218, 210, and the Arkansas Labor and Hours Relation Code ("ALHRC"), Ark. Code Ann. § 11-4-405. Plaintiffs also allege claims for breach of contract, promissory estoppel, and unjust enrichment.

Before the Court is plaintiffs' motion for partial summary judgment on the successor liability of CDIHS (Dkt. No. 89). CDIHS has responded (Dkt. No. 107) and filed a cross motion for summary judgment on the issue of successor liability (Dkt. No. 109). Plaintiffs have responded to CDIHS's cross motion for summary judgment (Dkt. No. 113), and CDIHS has replied (Dkt. No. 119). For the reasons that follow, plaintiffs' motion for partial summary judgment is denied (Dkt. No. 89), and CDIHS's cross motion for summary judgment on the issue of successor liability is granted (Dkt. No. 109).

## I.      Background

Plaintiffs are former employees of Child Development.  Child Development, as a grantee, operated Head Start programs in twelve counties in Arkansas (hereinafter "Tri-Region, Arkansas").   Plaintiffs allege that Child Development did not pay any employees between January 9, 2012, and February 10, 2012; that, between November 15, 2011 and January 9, 2012, Child Development withheld for its own use money from plaintiffs' compensation that Child Development claimed to be for plaintiffs' 403(b) retirement accounts and insurance premiums; and that Child Development deprived plaintiffs and all other employees of Child Development of earned leave time upon discharging plaintiffs and all other similarly situated employees on February 3, 2012.

Plaintiffs and CDIHS agree that, during the relevant time period, CDIHS did not employ plaintiffs, had no control of Child Development's funds or operations, did not fail to pay plaintiffs, had no contractual relationship with plaintiffs, made no promises to plaintiffs, and did not fail to handle properly insurance premiums and retirement plan contributions.   Instead, CDIHS is assigned interim grants from the national Office of Head Start, Administration for Children and Families ("ACF/OHS"), U.S. Department of Health and Human Services, to operate Head Start grant recipient programs on an interim basis when a local Head Start grantee cannot operate a Head Start program.   The parties agree that CDIHS was assigned an interim grant when the local Head Start grantee Child Development stepped aside.

On or about January 31, 2012, Child Development notified the Region VI, Department of Health and Human Services, Office of Head Start that Child Development overspent its budget, could not maintain the program, and could not make the next payroll.   On January 31, 2012, Community Development Institute ("CDI") was given notice by ACF/OHS pursuant to the

Office of Head Start-National Interim Management Program ("NIMP") contract that it might be needed to oversee the implementation of interim Head Start services in Tri-Region, Arkansas. In turn, a grant was awarded by the National Office of ACF/OHS to CDIHS as the interim provider of the Head Start services in Tri-Region, Arkansas. On or about February 2, 2012, Child Development voted to relinquish its grant and, thereafter, notified ACF/OHS in writing of its decision to relinquish operation of the Head Start programs it was operating in Tri-Region, Arkansas. On or about February 11, 2012, CDIHS began serving as the interim provider of the Head Start services in Tri-Region, Arkansas, the area formerly served by Child Development.

Plaintiffs and CDIHS agree that CDIHS did not apply or submit a bid to become the interim grantee of the Head Start program serving the Tri-Region, Arkansas. CDIHS was awarded the grant because of the NIMP contract. Plaintiffs and CDIHS agree that the role of CDIHS is to deliver interim Head Start services with little disruption to the children and families receiving the services and to develop a Head Start program that is in compliance with Head Start Performance standards.

By way of background, CDI is a Colorado nonprofit corporation with offices in Denver, Colorado, which is organized pursuant to § 501(c)(3) of the Internal Revenue Code. CDIHS claims it also is a Colorado nonprofit corporation with offices in Denver, Colorado, and is organized pursuant to § 501(c)(3) of the Internal Revenue Code. Plaintiffs deny these allegations as to CDIHS but cite no authority in support of the denial.

CDIHS maintains that it is the sole contractor with the ACF/OHS to provide services to the Office of Head Start-NIMP. Plaintiffs dispute this with no citation to authority. CDIHS further maintains that the NIMP contract requires CDI to maintain a permanent professional staff capable of providing the knowledge base, procedures, and technical, legal, financial, and

management expertise necessary for the operation of a Head Start program, while ACF/OHS engages in the discretionary grants competition process for the selection of a permanent replacement grantee. Plaintiffs again dispute this with no citation to authority. CDIHS contends that, upon appointment, CDI must be prepared to be onsite as the representative of ACF/OHS within 48 hours of being appointed and that the contract does not allow for additional negotiations over any potential employee claims against the suspended/terminated/relinquished grantee. Plaintiffs deny this. CDIHS maintains that, under the circumstances, the focus is on maintaining the delivery of services to the underprivileged children eligible for Head Start services. Plaintiffs dispute this with no citation to authority.

Plaintiffs and CDIHS agree that, as a part of its NIMP contract, CDI must maintain a roster of qualified contract managers capable of implementing an interim program. CDI assigns CDIHS to operate the day-to-day delivery of interim Head Start services in local areas. CDIHS is assigned interim grants from the national ACF/OHS office to operate Head Start grant recipient programs on an interim basis when a local Head Start grantee cannot operate a Head Start program.

CDIHS was assigned a new, separate grant with a new and unique grant identification number to operate the Head Start program in Tri-Region, Arkansas, on an interim basis while the ACF/OHS conducted the solicitation and application process to select a permanent replacement grantee to operate the Head Start program for the counties in the Tri-Region, Arkansas. Plaintiffs contend Child Development and CDIHS created a Memorandum of Understanding to govern parts of the transition process. CDIHS disputes that the Memorandum of Understanding was ever executed and refers to it as a "proposed" Memorandum of Understanding (Dkt. No. 108, ¶ 9; Dkt. No. 111, ¶ 19). Plaintiffs and CDIHS agree that CDIHS operates programs in

many, but not all, of the facilities formerly occupied by Child Development.  However, it has paid rent of $7,500.00 per month for 14 months to Child Development for facilities owned by Child Development, and CDIHS does not use some facilities owned by Child Development.  The children eligible to receive federal Head Start services under applicable guidelines are the same, irrespective of what entity may be providing the services.

Plaintiffs and CDIHS agree that CDIHS employed a majority of the former employees of Child Development.  Employees of Child Development that were interested in employment with CDIHS were required to attend a job fair, review terms and conditions of employment with CDIHS, file an application for specific positions, participate in an interview, and be selected for employment with CDIHS in the sole discretion of CDIHS.  Plaintiffs' last day of employment with Child Development was February 10, 2012, and first day of employment for those hired by CDIHS was Monday, February 13, 2013.  The parties agree that CDIHS employed 361 staff members formerly employed by Child Development.  The parties also agree that CDIHS hired Jana Bays, Elizabeth Cox, Rosemary Henry, and Deborah Brown to administrative and management positions.  CDIHS states that Ms. Bays is currently the Program Director but previously served Child Development as Early Head Start Director/Assistant Director.  Ms. Cox is currently a fiscal manager, Rosemary Henry is currently the administrative assistant for payroll, and Deborah Brown is currently the administrative assistant for AP/AR (Dkt. No. 111, ¶ 24).  However, CDIHS contends it did not hire any of the executives or other officers of Child Development.  Plaintiffs disagree but fail to elaborate.

Plaintiffs contend that CDIHS received $4,661,605.00 as an initial grant from the Office of Head Start to run the operations in Tri-Region, Arkansas (Dkt. No. 91, ¶ 6).  Plaintiffs also contend that CDIHS submitted a budget proposal for $9,272,669.00 for operation of the Head

Start/Early Head Start facilities for Tri-Region, Arkansas, for February 1, 2012, through January 31, 2013 (*Id.*, ¶ 18).  Plaintiffs claim that CDIHS could have requested funds in its budget proposal to cover the back pay of wages owed to plaintiffs by Child Development (*Id.*, ¶ 19).  CDIHS disputes this.

CDIHS makes several assertions that plaintiffs dispute.  CDIHS maintains that CDI and CDIHS are separate entities from Child Development and that neither shares nor has ever shared management or operations with Child Development (Dkt. No. 111, ¶ 14).  CDIHS contends that neither CDI nor CDIHS may apply to be the permanent replacement Head Start grantee (*Id.*, ¶ 7).  CDIHS asserts that the grant received by CDIHS is a "categorical federal grant, which was designated for Head Start services to children for approximately twelve months, beginning February 11, 2012. . . .  Its use is restricted for that purpose, and its grant funds are not available to pay the obligations of a terminated/suspended/relinquished grantee for work previously performed pursuant to a different grant.  Rather, these grants are prospective and relate only to the provision of future services.  If such grant funds were used to pay for Child Development, Inc.'s unsatisfied obligations, it would be at the expense of the underprivileged children Head Start serves." (*Id.*, ¶ 16).  CDIHS also maintains that "[t]here was no 'transfer' of federal funding from Child Development, Inc., to [CDIHS] nor was there any transfer of Child Development, Inc.'s corporate assets to [CDIHS].  Child Development, Inc., was funded by a grant obtained through Region VI, Department of Health and Human Services, Office of Head Start, which is located in Dallas, Texas.  [CDIHS] is funded through a grant from the national Office of Head Start located in Washington, D.C." (*Id.*, ¶ 17).  Plaintiffs deny these allegations.

CDIHS also maintains that "[n]o assets or facilities owned by Child Development, Inc., have been transferred to or possessed by [CDIHS].  The only facilities, equipment or supplies

possessed or used by [CDIHS] that were formerly used or possessed by Child Development, Inc., are those which were purchased with ACF/OHS grant proceeds.  This does not mean that Child Development, Inc., has no assets.  While it has filed for receivership and dissolution, . . . there are assets of which it is disposing in that proceeding. . . .  Both real and personal property purchased with ACF/OHS grant proceeds are not owned by the grantee acquiring them.  Such property is subject to a federal interest and must be transferred to the next grantee for the benefit of the children receiving Head Start services.  They are not held in trust for the federal government by [CDIHS] and are not owned in fee absolute by [CDIHS].  Now that permanent replacement grantees for the counties in TriRegion Arkansas have been selected to begin operations in the summer of 2013, [CDIHS] will be required to transfer any such property to the permanent grantee."  (*Id*., ¶ 20).  CDIHS also maintains that it "did not purchase Child Development, Inc., or any of its assets.  It did not engage in any negotiations with Child Development, Inc., regarding purchase or acquiring assets owned by Child Development, Inc." (*Id*., ¶ 31).  Plaintiffs do not agree.  CDIHS also states it has no assets or profits which can be used at its discretion (*Id.*, ¶ 18).  Plaintiffs claim they are without sufficient knowledge to admit or deny this allegation and, therefore, deny it.

## II.     Summary Judgment Standard

Summary judgment is proper if the evidence, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact and that the defendant is entitled to entry of judgment as a matter of law.  Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A factual dispute is genuine if the evidence could cause a reasonable jury to return a verdict for either party.  *Miner v. Local 373*, 513 F.3d 854, 860 (8th Cir. 2008). "The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather,

the dispute must be outcome determinative under the prevailing law." *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989).  However, parties opposing a summary judgment motion may not rest merely upon the allegations in their pleadings.  *Buford v. Tremayne*, 747 F.2d 445, 447 (8th Cir. 1984).  The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact.  *Celotex Corp.*, 477 U.S. at 323.  The burden then shifts to the nonmoving party to establish that there is a genuine issue to be determined at trial.  *Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 2008).  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## III.    Analysis

Plaintiffs seek to impose successor liability on CDIHS.  The Court will examine the doctrine of successor liability under federal labor laws as it relates to plaintiffs' federal statutory claims.  The Court will then examine the doctrine of successor liability under Arkansas law.

### A.    Successor Liability Under Federal Labor Laws

The general rule of corporate liability is that, when a corporation sells all of its assets to another, the latter is not responsible for the seller's debts or liabilities, except where:  (1) the purchaser expressly or impliedly agrees to assume the obligations; (2) the purchaser is merely a continuation of the selling corporation; or (3) the transaction is entered into to escape liability. *Golden State Bottling Co., Inc. v. N.L.R.B.*, 414 U.S. 168, 182 n.5 (1973).  However, "[t]he perimeters of the labor-law doctrine of successorship [] have not been so narrowly confined."  *Id.* Beginning with *Golden State* and other cases arising under the National Labor Relations Act ("NLRA"), "federal courts have developed a federal common law successorship doctrine that now extends to almost every employment law statute."  *Steinbach v. Hubbard*, 51 F.3d 843, 845

(9th Cir. 1995); *see Upholsterers' Int'l Union Pension Fund v. Artistic Furniture of Pontiac,* 920 F.2d 1323 (7th Cir. 1990) ("*Upholsterers*") (Multiemployer Pension Plan Amendments Act ("MPPAA")); *Secretary of Labor v. Mullins,* 888 F.2d 1448 (D.C. Cir. 1989) (Mine Safety and Health Act); *Criswell v. Delta Air Lines, Inc.,* 868 F.2d 1093 (9th Cir. 1989) (Age Discrimination in Employment Act); *Trustees for Alaska Laborers-Construction Industry Health & Sec. Fund v. Ferrell*, 812 F.2d 512 (9th Cir. 1987) (ERISA); *Musikiwamba v. ESSI, Inc*., 760 F.2d 740 (7th Cir.1985) (42 U.S.C. § 1981); *Dominguez v. Hotel, Motel, Restaurant & Misc. Bartenders*, 674 F.2d 732 (8th Cir. 1982) (Title VII); *Leib v. Georgia-Pac. Corp.*, 925 F.2d 240, 245-46 (8th Cir. 1991) (Vietnam Veteran's Readjustment Act).   This Court and others have specifically found that successorship may apply to claims arising under the FLSA, as well (Dkt. No. 22) (citing *Brock v. LaGrange Equip. Co.*, CV 86-0-170, 1987 WL 39105 (D. Neb. July 14, 1987); *Steinbach*, 51 F.3d at 845).

    "Successorship liability was originally adopted under the NLRA to avoid labor unrest and provide some protection for employees against the effects of a sudden change in the employment relationship." *Steinbach*, 51 F.3d at 845 (citing *Golden State*, 414 U.S. at 182-85; *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 549 (1964)).   "In deciding to extend successorship liability to other contexts, courts have recognized that extending liability to successors will sometimes be necessary in order to vindicate important statutory policies favoring employee protection."   *Id*.; *see also Upholsterers*, 920 F.2d at 1326.   Therefore, the question of successorship in the labor context "requires analysis of the interests of the new employer and the employees and of the policies of the labor laws in light of the facts of each case and the particular legal obligation which is at issue, whether it be the duty to recognize and bargain with the union, the duty to remedy unfair labor practices, the duty to arbitrate, etc." *Howard Johnson*

*Co. v. Detroit Local Joint Executive Bd., Hotel & Rest. Emp. & Bartenders Int'l Union, AFL-CIO*, 417 U.S. 249, 264 n.9 (1974).  The inquiry is fact intensive.  *N.L.R.B. v. Winco Petroleum Co.*, 668 F.2d 973, 975 (8th Cir. 1982).  "Particularly in light of the difficulty of the successorship question, the myriad factual circumstances and legal contexts in which it can arise, and the absence of congressional guidance as to its resolution, emphasis on the facts of each case as it arises is especially appropriate."  *Howard Johnson*, 417 U.S. at 254.  "There is, and can be, no single definition of 'successor' which is applicable in every legal context.  A new employer, in other words, may be a successor for some purposes and not for others."  *Id*. at 262 n.9.

The Eighth Circuit has adopted the nine-factor test for determining successorship stated in *Equal Employment Opportunity Comm'n v. MacMillan Bloedel Containers, Inc.*, 503 F.2d 1086, 1094 (6th Cir. 1974).  *See Prince v. Kids Ark Learning Ctr., LLC*, 622 F.3d 992, 995 (8th Cir. 2010) ("The leading approach to resolving questions of successor liability remains the Sixth Circuit's decision in *MacMillan,* where the court set forth a nine-factor test to be applied on a case-by-case basis.").  The nine *MacMillan* factors are:  (1) whether the successor company had notice of the charge; (2) the ability of the predecessor to provide relief; (3) whether there has been a substantial continuation of business operations; (4) whether the new employer uses the same plant; (5) whether the new employer uses the same or substantially the same work force; (6) whether the new employer uses the same or substantially the same supervisory personnel; (7) whether the same jobs exist under substantially the same working conditions; (8) whether the new employer uses the same machinery, equipment, and methods of production; and (9) whether the new employer produces the same product.  *Prince*, 622 F.3d at 995 (citing *MacMillan*, 503 F.2d at 1086); *see also Leib*, 925 F.2d 247 (same).  These factors were subsequently incorporated into FMLA regulations.  29 C.F.R. § 825.107.  As noted by other courts and as noted in this

Court's previous order, the *MacMillan* factors can be condensed to only the first three factors – notice, ability of the predecessor to provide relief, and substantial continuity – as the fourth through ninth factors are essentially subfactors for determining substantial continuity. *See Wheeler v. Snyder Buick, Inc.*, 794 F.2d 1228, 1236 n.7 (7th Cir. 1986) ("The third factor represents an amalgamation of a number of indicia of continuity set forth in *MacMillan* . . . .").

The *MacMillan* factors "are not in themselves the test for successor liability. . . . The ultimate inquiry always remains whether the imposition of the particular legal obligation at issue would be equitable and in keeping with federal policy." *Prince*, 622 F.3d at 995 (quoting *Cobb v. Contract Transp., Inc.*, 452 F.3d 543, 554 (6th Cir. 2006)). "Instead, the [*MacMillan*] factors are simply factors courts have considered when applying the three prong balancing approach, considering the defendant's interests, the plaintiff's interests, and federal policy." *Cobb*, 452 F.3d at 554. Likewise, "all nine factors will not be applicable to each case. Whether a particular factor is relevant depends on the legal obligation at issue in the case." *Id.* The Court will apply these factors to the present case.

### 1.    Transfer Of Assets

As an initial matter, the Court first addresses the parties' dispute as to whether there must be a transfer of assets or property. CDIHS contends that the "threshold inquiry" is whether there was a transfer of assets. This Court, in denying CDIHS's motion to dismiss, rejected CDIHS's reliance on only whether a transfer of assets occurred (Dkt. No. 22). There is no explicit requirement of a transfer of assets in the "substantial continuity" test for successor liability. *See Cobb*, 452 F.3d at 554-55 ("Because the merger or transfer of assets is not a precondition to successor liability in the labor law (or Title VII) context, it is not a precondition for liability in the FMLA context."); *Leib*, 925 F.2d at 247 (holding that the district court erred in focusing

exclusively on whether there was continuity in "ownership or control" and not considering all of the relevant factors under the substantial continuity test).  However, the Court recognizes that whether a transfer of assets occurred may be relevant to the finding of substantial continuity when balancing the equities in a particular case.  *Cobb*, 452 F.3d at 556 ("Title VII cases do consider the existence of a merger or transfer of assets, and we believe that in some cases consideration of the existence of a merger or transfer of assets is appropriate.") (citing *EEOC v. Vucitech*, 842 F.2d 936, 945 (7th Cir. 1988)); *see, e.g.*, *Korlin v. Chartwell Health Care, Inc.*, 128 F. Supp.2d 609, 614 (E.D. Mo. 2011) (declining to impose successor liability under Title VII on the facts presented without a merger or transfer of assets because the court concluded that, if the cost of liability was not reflected in any purchase price, imposition of successor liability would not be equitable).  Accordingly, the Court will consider the nature of the transaction as it relates to the *MacMillan* factors and the balance of the equities.

## 2.    Substantial Continuity

The Court also gives consideration to whether there is substantial continuation of the operations.  The facts here are not disputed that CDIHS used most of the same facilities as Child Development; employed substantially the same work force and substantially the same supervisory personnel, at least as to the management of CDIHS's operations in Child Development's former service area; had substantially the same working conditions; and provided substantially the same services.  CDIHS maintains that, despite meeting these factors, the nature of the transaction here differs from those transactions in which successor liability has been imposed.

In support of this, CDIHS cites the way in which assets first used by Child Development and then used by CDIHS are held.  CDIHS claims that Child Development held nominal title to

these assets and that the assets were actually held in trust for the beneficiaries of the Head Start program.  *See Neukirchen v. Wood County Head Start*, 54 F.3d 809 (7th Cir. 1995) (analyzing the application of this federal interest to a Head Start grant recipient).  While CDIHS may use program assets formerly used by Child Development, CDIHS's use is also subject to these same trust limitations.  As a result, when a permanent replacement grantee is selected to provide Head Start services beginning in the summer of 2013, in the Tri-Region, Arkansas, CDIHS will have the same obligation to transfer program assets to the selected grantee as required by ACF/OHS (Dkt. No. 110, at 5-7).

CDIHS also argues that there is no substantial continuation of business operations in view of the interim nature of its operations.  As CDIHS explains, Child Development was a permanent, long-term grantee selected through the traditional competitive application process and, provided it met ACF/OHS quality standards, could have continued to apply for and receive Head Start grants.  In contrast, CDIHS was brought in under an existing contract to provide temporary, interim Head Start services for approximately 12 months to allow for a new long-term grantee to be selected pursuant to the traditional competitive grant process.  CDIHS contends that "[p]roviding Head Start services in a defined area of one state for an indefinite period is a fundamentally different business than being on standby to perform interim services typically limited to one year in unidentified areas throughout the United States."  (Dkt. No. 110, at 12).  The Court agrees.  Without more, the subfactors of the facilities, workforce, and services could suggest substantial continuation of operations.  However, the Court cannot find substantial continuity given the nature of the transaction and CDIHS's temporary involvement in providing Head Start services in Tri-Region, Arkansas.

Even if the Court were to find substantial continuity, "[t]he ultimate inquiry always remains whether the imposition of the particular legal obligation at issue would be equitable and in keeping with federal policy." *Prince*, 622 F.3d at 995. As discussed in more detail below, the nature of this transaction weighs against a finding of successor liability.

### 3. Notice And The Predecessor's Ability To Provide Relief

The Seventh Circuit has explained that notice and the predecessor's ability to provide relief are "critical" because "it would be inequitable to hold a successor liable when it was unable to take the liability into account in negotiating the acquisition price or when the predecessor was capable of paying and merely attempted to externalize the liability onto another party." *Upholsterers*, 920 F.2d at 1327 (citing *Wheeler*, 794 F.2d at 1236); *see also Brock*, 1987 WL 39105, at *2 ("The notice inquiry is more significant in the case of a disinterested third party purchased than in a situation involving the same parties on both sides of the transaction.") (citing *Evans Servs., Inc. v. N.L.R.B.*, 810 F.2d 1089, 1093 n.5 (11th Cir. 1987)). *Steinbach*, 51 F.3d at 847 ("The principle reason for the notice requirement is to ensure fairness by guaranteeing that a successor had an opportunity to protect against liability by negotiating a lower price or indemnity clause."); *Musikiwamba*, 760 F.2d at 752 (same). Because these factors are interrelated, the Court will examine and address them together.

The Court first considers the ability of the predecessor to provide relief. This factor is examined because "it would be grossly unfair, except in the most exceptional circumstances, to impose successor liability on an innocent purchaser when the predecessor is fully capable of providing relief or when the successor did not have the opportunity to protect itself by an indemnification clause in the acquisition agreement or a lower purchase price." *Musikiwamba*, 760 F.2d at 750. It appears that there are obstacles to Child Development's providing relief.

Indeed, CDIHS's involvement in this case was necessitated in large part by Child Development's relinquishing its grant due to its inability to meet its financial obligations.  Child Development has filed for receivership and dissolution in state court.

As for notice, the parties do not dispute that CDIHS had some knowledge of the unpaid wages.  CDIHS "admits that it had an awareness or general knowledge that [Child Development] had not paid its employees," but CDIHS claims it "did not have access to the records of [Child Development] to give it actual knowledge of what was owed or to whom."  (Dkt. No. 108, ¶ 12). CDIHS maintains that, for notice to be meaningful, it must be adequate to allow the successor to protect itself, *e.g.*, by accounting for notice of the violations in negotiating the purchase of a business or its assets (Dkt. No. 107, at 7) (citing *NLRB v. Leiferman Enterprises, LLC*, 649 F.3d 873, 879 (8th Cir. 2011)).  Plaintiffs acknowledge that the purpose of the notice requirement is to permit a successor to use this information and to account for any liabilities when it acquires a predecessor (Dkt. No. 113, at 6).  Even with this, however, the parties dispute whether the notice CDIHS had was adequate.

CDIHS argues it did not have adequate notice because its NIMP contract "allowed neither [the] time *nor the ability* to negotiate any provisions to allow it to accommodate liability for [Child Development]'s failure to pay wages."  (Dkt. No. 107, at 7-8).  CDIHS emphasizes that any negotiation as to its NIMP contract for interim management predated notification of Child Development's relinquishment of its grant (Dkt. No. 110, at 10).  In addition, according to the affidavit of Carolyn Miller, in the event that a Head Start program is suspended, terminated, or relinquished,  ACF/OHS, without further negotiation, appoints CDIHS to establish an interim Head Start program in the area formerly serviced by the suspended/terminated/relinquished grantee.  CDIHS must be prepared to be onsite as a representative of the ACF/OHS within 48

hours of being appointed as an interim grantee. CDIHS and Ms. Miller state that CDIHS's NIMP contract does not allow for negations for any potential employee claims against the predecessor grantee and that paying the obligations of the predecessor grantee is not a permitted obligation of CDIHS's grant. Plaintiffs disagree and contend that CDIHS "was in a position to account for this liability when it took over the programs." (Dkt. No. 113, at 6).

Plaintiffs argue that contracting for liability is not the only method by which CDIHS could have accounted for liability. Despite the affidavit of Ms. Miller to the contrary, plaintiffs argue that CDIHS had the ability to request or allot funding to cover its liability. Plaintiffs cite CDIHS's Funding Proposal Narrative for program year February 1, 2012, to January 31, 2013, and claim that CDIHS "could have easily allotted or requested additional funds to cover the liabilities" because the funding narrative "lays out a budget specifically for staff salaries" (Dkt. No. 113, at 6-7; *see* Dkt. No. 111-12, at 10). Plaintiffs also point to the allotment in the Funding Proposal Narrative for $22,826 for "Liability / Legal Services [and] Legal Expenses" (Dkt. No. 111-12, at 12). Plaintiffs argue in their response that CDIHS's only evidence that it cannot use the budget to cover back pay is "the self-serving affidavit of Carolyn Miller." Plaintiffs contend nothing in the NIMP contract prevents using grant funds or requesting grant funds for the use of paying outstanding obligations incurred by the previous grantee.

The Court rejects plaintiffs' arguments. Plaintiffs' arguments rely on little, if any, evidence in the record, and plaintiffs wholly fail to meet proof with proof as to Ms. Miller's affidavit. First as to plaintiffs' claim regarding the funding proposal, it appears that the allotment for salaries is only for current or future employees *of CDIHS*. The Court is not persuaded this line item could be used to satisfy Child Development's past obligation. Likewise, the Court is not persuaded that a line item for "Liability / Legal Services [and] Legal Expenses" is meant to

cover the obligations of a previous grantee.  Plaintiffs cite to no legal authority for their position and rely on no evidence in the record to support their arguments as to these two items, instead pointing only to the language of the form and the purported absence of restrictions in the NIMP contract.

Plaintiffs also do not counter Ms. Miller's affidavit.  Ms. Miller's affidavit provides that the NIMP contract does not allow for negations for any potential employee claims against the predecessor grantee, that paying the obligations of the predecessor grantee is not a permitted obligation of CDIHS's grant, and that CDIHS's grants are prospective and relate only to the provision of future services.  Instead, plaintiffs simply dismiss the affidavit as self-serving.

In further response to plaintiffs' claim that Ms. Miller's affidavit is self-serving, CDIHS in support of its reply presents the affidavit of Peter Thompson, the Director of Grants Policy Division, Administration for Children and Families, HHS, which corroborates Ms. Miller's affidavit (Dkt. No. 119-1).  Mr. Thompson states in part:

> Under the applicable Office of [M]anagement and Budget Circulars and regulations, a new grant does not and cannot provide funds to pay the liabilities of a terminated grantee, which includes a grantee that has relinquished its grant.  See 45 C.F.R. §1303.2 (defining termination to include voluntary relinquishment); [see Termination and Enforcement under A-110 and Termination Costs Applicable to Sponsored Agreements under A-122].

(Dkt. No. 119-1, ¶ 11).

CDIHS also in its reply presents the affidavit of Patricia Terry, the accounting manager for CDIHS, in which Ms. Terry states that the line item for "Liability / Legal Services [and] Legal Expenses" is only for future legal expenses for CDIHS and in no way reflects liability for the prior grantee (Dkt. No. 119-2).

These points underscore the deficiency of notice here which, when coupled with the nature of the transaction itself, persuades this Court that successor liability is inappropriate.

Although CDIHS admits having "general" knowledge that Child Development had not paid its employees, CDIHS's funding proposal narrative states CDIHS "has been left to make sense of things with no help from the previous grantee."  (Dkt. No. 111-12).  In addition, the record indicates that CDIHS was unable to execute the Memorandum of Understanding with Child Development due to "the lack of reliable obtained information" (Dkt. No. 90-8).  More importantly, however, CDIHS has demonstrated that, even if it had sufficient knowledge of the potential claims against Child Development, it had no ability to account for those claims. Plaintiffs cite to no legal authority or record evidence that contradicts CDIHS's showing that it could not negotiate the terms of its interim grant, request funds for Child Development's obligations, or otherwise account for the liability of Child Development for alleged past employment law violations.

Plaintiffs and CDIHS agree that CDIHS did not apply or submit a bid to become the interim grantee of the Head Start program serving the Tri-Region, Arkansas.  CDIHS was awarded the grant because of the NIMP contract that predated its notice of Child Development's relinquishment.  This is not a situation in which the parties could negotiate to account for the risks presented by this type of notice; they could not shift the potential liability in a bargained-for transaction or seek an indemnification agreement from Child Development before becoming an interim grantee for Child Development under the NIMP contract.  Under the facts of this case, based on the record evidence before the Court, the deficient notice coupled with CDIHS's inability through the interim grant process to account for the obligations of Child Development counsel against imposing successor liability.

The Court acknowledges that, if successor liability is not imposed, plaintiffs may be without a meaningful remedy as there are obstacles to Child Development's ability to provide

relief.   As to the employees' interest, "[t]he balancing process includes an emphasis upon protection for the victimized employee, who is 'now without meaningful remedy when title to the employing business changes hands.'"   *Winco*, 668 F.2d 978 (quoting *Golden Stat*e, 414 U.S. at 181).   The FLSA was passed to protect workers' standards of living through the regulation of working conditions.   29 U.S.C. § 202.   "That fundamental purpose is as fully deserving of protection as the labor peace, anti-discrimination, and worker security policies underlying the NLRA, Title VII, 42 U.S.C. § 1981, ERISA, and MPPAA."   *Steinbach*, 51 F.3d at 845. However, here, there is a competing federal interest under the Head Start program, which exists "to promote the school readiness of low-income children by enhancing their cognitive, social, and emotional development."   42 U.S.C. § 9831.

Plaintiffs and CDIHS agree that the role of CDIHS is to deliver interim Head Start services with little disruption to the children and families receiving the services and to develop a Head Start program that is in compliance with Head Start Performance standards.   Plaintiffs seek to impose successor liability on CDIHS by virtue of its acceptance of federal grant money to run a troubled, local Head Start program on an interim basis.   Imposing successor liability in this context on the facts presented risks impeding the federal policy of the Head Start program.

Balancing the parties' interests and the federal policies at issue, the Court finds that successor liability should not lie in this case.   Accordingly, the Court finds that CDIHS is not a successor in interest to Child Development for purposes of plaintiffs' claims under the FLSA and ERISA.   Therefore, CDIHS's motion for summary judgment as to these claims is granted.

## B.      State Law Successorship

Defendants also move for summary judgment on the issue of successor liability as to plaintiffs' state-law claims.   Under Arkansas law, the general rule is that a corporation which

purchases the assets of another corporation does not succeed to the liabilities of the selling corporation. *Ford Motor Co. v. Nuckolls*, 894 S.W.2d 897, 903 (Ark. 1995). However, the general rule is subject to the following exceptions: (1) where the transferee assumes the debts and obligations of the transferor by express or implied agreement; (2) where there is a consolidation or merger of the two corporations; (3) where the transaction is fraudulent or lacking in good faith; and (4) where the purchasing corporation is a mere continuation of the selling corporation. *Id*. "The general rule and its exceptions have long been a part of Arkansas law." *Swayze v. A.O. Smith Corp.*, 694 F. Supp. 619, 622 (E.D. Ark. 1988) (citing *Good v. Ferguson & Wheeler Land, Lumber & Handle Co.*, 153 S.W. 1107 (Ark. 1913)).

Here, plaintiffs claim the "mere continuation exception." Courts considering this exception "emphasize a common identity of officers, directors, and stock between the selling and purchasing corporations." *Campbell v. Davol, Inc.*, 620 F.3d 887, 892 (8th Cir. 2010) (quoting *Swayze*, 694 F.Supp. at 622-23). Notably, "it is not the general overlap of employees that is relevant in determining whether the mere continuation exception applies; rather, it is the common identity of officers and directors between the selling and purchasing corporations with which the court is concerned." *Id*. In addition, "common identity of assets is not one of the factors that is considered in determining whether a purchasing corporation is a mere continuation of a selling corporation under Arkansas law, according to *Swayze*." *Id*.; *see also* 15 *Fletcher Cyc. Corp*. § 7124.10 ("In determining whether one corporation is a continuation of another, the test is whether there is a continuation of the corporate entity of the transferor, not whether there is a continuation of the transferor's business operations.")

CDIHS argues that it is not a successor company under the mere continuation exception because there was no transfer of stock or other assets and there is not an officer/ director overlap.

As an initial matter, the parties do not address whether a transaction is required under the mere continuation exception in Arkansas.  Nonetheless, the Court agrees with CDIHS that the requirements for the mere continuation exception are not met here.  Clearly, there was no transfer of stock.  Further, although CDIHS hired some management and administrative personnel for the Head Start program in Tri-Region, Arkansas, this can hardly be said to be a "common identity of officers and directors."  Moreover, for the reasons stated, the Court has determined that plaintiffs cannot meet the more liberal successor liability standard under federal labor and employment laws.  For these same reasons, plaintiffs cannot show successorship under the narrower "mere continuation" exception to the traditional rule of successor liability applied in Arkansas.  Therefore, the Court grants CDIHS's cross motion for summary judgment as to plaintiffs' state-law claims, and these claims are dismissed with prejudice.

*    *    *

Plaintiffs' motion for summary judgment is denied (Dkt. No. 89).  CDIHS's cross motion for summary judgment is granted (Dkt. No. 109).  Finding no successor liability on the part of CDIHS as a matter of law, plaintiffs' claims against CDIHS are dismissed with prejudice. Judgment in favor of CDIHS will be entered accordingly.

SO ORDERED this the 7th day of January, 2014.

_____
Kristine G. Baker
United States District Judge